# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

ROBERT CASTLEBERRY,

    Plaintiff,

    v.

CAMDEN COUNTY,

    Defendant.

CV 2:16-00128

## ORDER

Plaintiff filed this action seeking damages pursuant to the Americans with Disabilities Act, as amended by the Americans with Disabilities Amendments Act of 2008 ("ADA"), and the Family and Medical Leave Act ("FMLA"). Dkt. No. 1 at 1. Before the Court are Defendant's Motion for Summary Judgment, dkt. no. 33, and Plaintiff's Motion for Partial Summary Judgment as to Liability, dkt. no. 35. These motions have been fully briefed and are ripe for review. For the reasons stated below, Defendant's Motion is **DENIED**, and Plaintiff's Motion is **DENIED**.

## BACKGROUND

### I. Plaintiff's Role at Camden County 4-H

The Camden County 4-H Extension Office provides services to youths aged 9-19, including hands-on learning programs, summer camps, classroom presentations, and community service activities.

Dkt. No. 35-3 ¶ 1. As part of Plaintiff's certification training to work for 4-H, Plaintiff described 4-H as a "youth outreach program." Dkt. No. 33-3 at 67. Plaintiff started working for the Camden County 4-H Extension Office in June 2013. Dkt. No. 35-3 ¶ 2. He was terminated on January 29, 2015. Id. ¶ 3. Throughout his employment with Camden County ("the County"), Plaintiff's immediate supervisor was Amber Bishop, who was the 4-H County Extension Coordinator. Id. ¶ 6.

In the 4-H office, Plaintiff worked as a "4-H Program Associate." Id. ¶ 4. Plaintiff agreed that his role was to work "with [the] county extension agent in planning, developing, and conducting one of several county sponsored programs and perform[] duties necessary to assist the county extension agent in the day-to-day conduct programs." Dkt. No. 33-2 at 97.

In this role, Plaintiff had a number of duties. When becoming certified to act as a 4-H Associate, Plaintiff listed some of his major duties as conducting "in-school and after school club meetings," assisting in "developing, preparing, and organizing 4-H materials for club meetings," and "provid[ing] leadership and assistance to 4-H special interest clubs, judging activities, project comp., awards, etc." Dkt. No. 33-3 at 68. In addition, the position description of a 4-H Program Associate, which was created by the County in June 2012, includes the "Essential Duties and Responsibilities" of: "[i]ncorporat[ing] the results of

program evaluations and feedback in planning future programs and techniques used in implementing programs," id. at 61; "[m]ak[ing] reports to appropriate clientele and public officials through media, personal contacts, and/or group meetings to provide information on progress of 4-H programs and coordinat[ing] reporting with other county staff members," id.; "[c]ooperat[ing] with other staff in preparing joint reports," id.; "show[ing] enthusiasm for job and project[ing] a positive attitude during Extension programs," id. at 62; "[e]xpress[ing] thoughts clearly and concisely through written and verbal communication," id.; and "[e]xpressing team spirit and cooperation by regularly participating in staff conferences (using them for planning and evaluation of joint activities) and sharing ideas among all co-workers, leaders, district staff, and specialists." Id. Notably, when Plaintiff listed his major duties, he used language identical to the position description. Id. at 61, 68.

Most of the above-listed duties required verbal communication. Verbal communications were, in other words, necessary for Plaintiff's job. Plaintiff recognized that the "elimination of verbal conversation was, of course, not possible." Dkt. No. 35-7 ¶ 32. But Plaintiff preferred "office communications [to] be predominantly over email with verbal communications when necessary." Id. Furthermore, Plaintiff recognized that there were certain skills or abilities that were necessary for his job,

such as: establishing and maintaining effective working relationships with employees, other agencies and the public; and following written and verbal instruction. Dkt. No. 33-2 at 82.

## II. Plaintiff's Performance Evaluations

On November 18, 2013, Plaintiff met with Bishop and the then 4-H District Extension Director for a performance review. Dkt. No. 35-17 at 1. The review evaluated Plaintiff's work performance from June 1, 2013 to October 31, 2013, the first five months Plaintiff worked for the County. Id. In the review, Plaintiff was rated in 27 categories of tasks or responsibilities. Dkt. No. 35-17 at 1-4. On a scale of 1 to 5, Plaintiff received two "2"s, which represented that he met "expectations in some areas but lack[ed] consistency." Id. The 2s were received in the categories: "Show enthusiasm for job and project a positive attitude"; and "Express team spirit and cooperation by regularly participating in staff conferences and sharing ideas among all co-workers, leaders, district staff, and specialists." Id. at 4. Comments on the former category stated that Plaintiff "struggle[d] with communications" in office meetings; similarly, the comments on the latter stated that he needed to "[i]mprove participation in office meetings." Id. The category of "[p]lan ahead and coordinate with staff members for programs" also stated he needed "to do a better job with communication." Id. at 3. The review

contained a section detailing "Major Goals for Coming Year," and the only goal listed was "[t]o communicate better with staff." Id. at 5. Bishop also noted that Plaintiff was "eager to do his best in club meetings, still learning his job, still concerned about job satisfaction and maintaining a positive attitude." Id. Nevertheless, the District Extension Director noted that "[Bishop] will be giving you more responsibility in the coming days. We feel certain you have the ability and skills to be an asset to [Bishop] and the program." Id. at 1.

Plaintiff had another performance evaluation a year later for the time period of November 1, 2013 to October 31, 2014.[1] Dkt. No. 35-18. Plaintiff received four 2s and twenty-three 3s, which stood for "meets expectations." Id. Along with these ratings were several notations giving Plaintiff feedback. Regarding negative feedback: Plaintiff was told he had "been given [reminders] about making sure [he could] hear the phone and doorbell to assist clients"; he had been given reminders "about not working outside of office hours without need or permission"; he was told to remember to ask questions when planning and coordinating with staff members for programs; he struggled to work

---

[1] Unlike the first performance evaluation, Plaintiff never had a meeting to review this evaluation, nor was he given the evaluation. Dkt. No. 35-6 at 21-22. Bishop planned to review the evaluation with Plaintiff in January 2015, but the evaluation never occurred because Plaintiff was placed on administrative leave and then fired. Id.

with adults and had a "[p]ast issue with attitude toward and sharing at staff meetings"; and he was "working to improve his focus in the office setting." Id. at 2-5. Under the category "[e]xpress thoughts clearly and concisely through written and verbal communication," Bishop rated Plaintiff as a 2 and noted "[e]merging medical reasons related to verbal communication," but that this category was "still necessary." Id. at 4; dkt. no. 31 at 99.

## III. Plaintiff's Struggles at Camden County 4-H

During her deposition, Bishop testified that Plaintiff was unable to establish and maintain effective work relationships with employees and that he struggled with effective verbal communication. Dkt. No. 31 at 57. More particularly, she testified that "[h]e struggled with oral [ ] comprehension and expression." Id. These struggles manifested themselves during office meetings and in Plaintiff becoming visually and audibly upset with his coworkers. Id. at 42. In office meetings, Plaintiff would sometimes, but not all the time, exhibit withdrawn behavior and would be "not interested in participating." Id. at 45. When Bishop had one-on-one meetings with Plaintiff, he did not seem interested at times. Id. at 46. Bishop testified that she felt that he did not feel comfortable communicating with her. Id. at 46.

At some point prior to Plaintiff's termination, Bishop compiled into a document: meeting notes she had taken; emails between her and Plaintiff; and notes created by coworkers. Dkt. No. 31-1 at 42-75. Bishop created this document to send to her district director, Cathy Baldwin, in order to receive advice on how to proceed with the issues between Plaintiff and the rest of the office staff. Dkt. No. 31 at 62, 63. Bishop "felt like [Baldwin] needed a full account of what had happened." Id. at 63. This information was part of the information that the County used when determining whether to fire Plaintiff. Id. at 110-11. Other than this document, several emails asking for a status update, and expressing her concern to her superiors that Plaintiff could not be her associate if he was unable to work in the office, Bishop had no role in the decision to fire Plaintiff. Id.

In the document Bishop created, the earliest entry chronologically was several notes, also taken by Bishop, describing what Kathy Strickland, the office/extension secretary, and Jessica Warren, an agricultural and natural resource agent, had told her regarding Plaintiff. Dkt. No. 31-1 at 74. These notes were taken as part of a memo that Bishop prepared for a meeting on May 30, 2014, between Bishop and Joann Milam, 4-H district director, dkt. no. 31 at 35, and Tina Dasha, a human resources employee of the County, dkt. no. 31-1 at 74. Bishop stated in the memo that Warren told her that she "had some major

concerns about [Plaintiff] and really wanted to share them with [Bishop]." Id. Warren was concerned because she thought that Plaintiff was "antisocial" and "unstable," and had "trouble with confrontation" and "an unpredictable temper." Id. Bishop noted that both Strickland and Warren felt like he talked back to them and that he acted like "he is the boss." Id. Warren also felt that Plaintiff might be "potentially dangerous," and that she was "concerned about our safety, and retaliation." Id. Bishop noted that her own "major issue with [Plaintiff] is that he seems to be defiant with me. That [was] getting to be too much." Id.

The concerns of Bishop, Strickland, and Warren led to a meeting on June 3, 2014, with Bishop, Dasha, and Plaintiff. Id. As part of this meeting, Bishop filled out a "Performance Correction Notice" documenting instances in which Plaintiff had either violated a policy or procedure or committed a behavioral infraction. Dkt. No. 33-3 at 104-116. This meeting led Plaintiff to contact Joann Milam, the Southeast District Director, and Kathy Baldwin, the Southeast District 4-H Program Development Coordinator, to file a list of employee grievances against Bishop. Dkt. No. 31-1 at 75. Documentation in the record indicates that on August 12, 2014, "these supervisors came to the Camden County Extension Office and met with [Plaintiff, Bishop, and Warren] individually and then with [Plaintiff and Bishop] and [Plaintiff

and Warren].  After this date, things seemed to flow ok until November."[2]  Id.

In November, tensions in the office became much worse.  Bishop noted that on November 13, 2014, she perceived that Plaintiff acted very unprofessionally and disinterested in an office meeting, and he said he had nothing to share.  Id. at 42.  On November 17, 2014, he sent an email to the office stating that he would "begin listing what I have accomplished" via email so that "office meetings can focus only on things that concern the entire office reducing their overall time."  Id.  This email prompted Bishop to have a meeting with Dasha and Plaintiff.  Id.  Bishop's notes regarding the meeting state that Plaintiff "did not take our meeting well," getting "very upset (crying)."  Id.  Bishop noted that Plaintiff told her that he felt like he was "being singled out and scrutinized and disrespected," that Bishop only "point[ed] out things he does wrong," and that Bishop never accepted his ideas.  Id.  Bishop and Dasha also suggested that Plaintiff seek counseling.  Id.  Lastly, they told Plaintiff that his talking under his breath "is perceived as being hostile," so they suggested that he write in a journal or go for a walk instead.  Id.  Bishop

---

[2] The record is unclear who penned this statement.  The statement is included in the compilation of documents referenced earlier that Bishop testified to compiling.

noted that Plaintiff responded "that he would feel like we would scrutinize him for doing that." Id.

On November 25, 2014, Strickland wrote a memo for Bishop detailing concerns about Plaintiff. Id. Bishop asked Warren, Strickland, and Sarah Newby, who also worked in the office, to write down their concerns after they "continued to come to [Bishop] expressing their concerns about [Plaintiff]." Id. Strickland stated there had been "a couple of issues in the past" with Plaintiff "getting upset about noise in the office (actually normal work atmosphere), and little things that really seemed to upset him." Id. In one office meeting, Plaintiff "was obviously having a really rough day and when I asked him to participate in our office discussion, he seemed to get very mad and left the meeting when finished, obviously very upset." Id. She noted that "several times when he would get upset about something" he would "go down the hall, muttering to himself obviously about the situation." Id. Strickland alleged that Plaintiff had "issues with most all the coworkers" and "seem[ed] to try to find things to retaliate (blaming others about things, calling out sick, not having much to say) when he gets corrected." Id. at 43. Strickland stated she was "a bit nervous about his anger management . . . he seems to get highly agitated and makes me very uncomfortable when he gets that way." Id. She "fear[ed] that one day he may get too upset and retaliate, putting us all in danger." Id.

Newby's memo to Bishop stated that "[Plaintiff] doesn't seem to handle criticism very well . . . respond[ing] to critiques on his professional behavior by blaming others." Id. Newby noted that she thought he "lack[ed] the ability to process his emotions in a socially acceptable manner because he struggles with communicating and/or is unwilling to share what he's feeling." Id. She "observed him muttering under his breath after [Strickland] ha[d] asked simple requests of him." Id.

## IV. Plaintiff's Accommodations Communications

Some time prior to December 18, 2015, Plaintiff asked Bishop to allow him to move to the back office. The back office was a back room that was separated from the rest of the offices. Dkt. No. 35-25. Then on December 17, 2014, Plaintiff told Tina Dasha, an HR official with Camden County, that he had been preliminarily diagnosed with Asperger's "and that they were going through the testing to . . . give it an official." Dkt. No. 35-3 ¶ 80. The next day, December 18, 2014, Bishop denied Plaintiff's request to move to the back office for numerous reasons. Id. ¶ 81. These reasons were that it did not have a desk, did not have an updated phone system, was full of storage containers, had the server in it, had bugs, lizards, spiders, stains and dirt on the floor, and had weeds growing through the window. Dkt. No. 43-1 ¶ 23.

On December 31, 2014, Plaintiff emailed Dasha in order to apply for intermittent leave under the Family and Medical Leave

Act ("FMLA"). Dkt. No. 35-15. As part of the paperwork, Lynn Roth, a Licensed Professional Counselor at LightHorse, noted that he was diagnosed with attention-deficit/hyperactivity disorder and inattentive social anxiety disorder. Id. at 4. In the "additional information" section, Roth noted that "[Plaintiff] has poor coping skills, is easily frustrated and has limited ability to navigate social interactions successfully," and that Plaintiff "would benefit from more tolerance of his social deficits, more positive reinforcement and advance notice of 'coaching' sessions to help patient prepare himself when constructive criticism is necessary." Id. at 5. Finally, the therapist noted that Plaintiff reported "that he ha[d] requested and ha[d] not been allowed to work in an isolated area, opt out of social events or wear noise cancelling head phones." Id.

That same day, the County approved the FMLA request, permitting Plaintiff to attend a 30-minute counseling session once a week and an additional therapy session once a month. Id. at 2. In the email message attaching the approval paperwork, Dasha asked Plaintiff whether she should "discuss the 'accommodations' mentioned on the form by the physician with [Bishop]?" Id. at 1. Plaintiff replied to that email stating that he "would prefer" to "discuss the accommodations with you[, Dasha,] first." Id.

On January 7, 2015, Bishop emailed Plaintiff to set up a meeting with him later that day. Dkt. No. 35-26 at 13. Bishop

AO 72A
(Rev. 8/82)

also let Plaintiff know that she had met with Dasha and discussed "some of the medical reasons you need accommodations in the office," and that "[s]ome may be possible, [but] some are not." Id. Bishop also stated that Plaintiff could talk to Bishop "about anything you shared with [Dasha]." Id. She also gave Plaintiff a list of five questions that she told Plaintiff she planned to ask him at the meeting. Id. The questions were:

- Explain to me a program or activity where I did not give you enough direction or instruction?

- How do you handle the noise levels on the bus with children or at Rock Eagle assemblies?

- Have you had similar issues with interacting with adult co-workers in the past? If so, how have you handled them?

- Do you like this job?

- Do you want this job?

Id. Plaintiff replied with a request to reschedule the meeting to the next day because he was "not feeling comfortable at the moment discussing these questions." Id. at 16. Bishop immediately responded "yes" and asked that Plaintiff set the time. Id. Around ten minutes later, Plaintiff emailed Bishop saying that he was not feeling well and that he scheduled an appointment with his therapist for later that day "to get some guidance." Id. at 14.

AO 72A
Rev. 8/82)

No meeting occurred the next day, January 8, 2015, but Plaintiff did email Bishop responding to her questions. Id. at 23-24. Later that day, Plaintiff forwarded to Dasha a letter from a psychotherapist at LightHorse, Allison Fender. Id. at 25-26. The letter stated that Plaintiff had "given LightHorse Healthcare permission to communicate with you to validate his need for treatment, as well as recommendations for possible measures that can be taken to facilitate better working relations and performance" for Plaintiff. Id. at 26. After stating that Plaintiff suffers from "a physical medical condition" causing extreme sensitivity to sound and that he has also been "diagnosed with biopsychosocial issues that cause him to have some difficulties in social and interpersonal situations," the letter presented "a list of [thirteen] possible options that may be helpful to all parties concerned." Id. The thirteen requests were for Plaintiff to:

- Wear noise canceling headphones to create a quiet atmosphere

- Relocate to an area away from distractions and sounds

- No "surprise" meetings, write-ups, or "coaching sessions"

- Advance notice of topics to be discussed in meetings and "coaching sessions"

- Communications via e-mail predominantly with verbal communication when needed

- All verbal communication provided [sic] written as well

- Periodic rest breaks away from workstation to clear mind

- Allow an advocate to be in attendance for performance reviews/disciplinary meetings

- Provide a written response in lieu of verbal @ [sic] office meetings

- Socialization and social functions optional unless necessary for job

- No criticism or write-ups unless in clear violation of policy

- Explain logic behind rules to allow better understanding

- Provide examples of rules as well for better understanding

<u>Id.</u>

The next morning, January 9, 2015, Dasha emailed Plaintiff stating that "we **absolutely** want to work with you," <u>id.</u> at 29 (emphasis in original), but that Dasha's manager was requiring Plaintiff to "see a <u>licensed clinical physician, clinical psychologist, or psychiatrist</u>." <u>Id.</u> (emphasis in original). The reason being that the diagnosis in the letter from LightHorse was from a "counselor" and thus the County needed a "<u>licensed medical professional</u> to do your diagnosis, recommendations, and FMLA

.O 72A
Rev. 8/82)

paperwork." Id. (emphasis in original). Plaintiff disagreed with the need for the County's request. Id. at 27-29.

On January 12, 2015, the County renewed their request that Plaintiff see a psychologist. Id. at 30. This time the County stated that they had an unaffiliated psychologist, Dr. Ellinor Burke, available to perform a diagnosis and that it would be billed to the County. Id. Plaintiff still maintained that what he provided from his licensed therapist was sufficient. Id.

The next day, January 13, 2015, Dasha emailed Plaintiff to "give [him] an update on [his] requested accommodations." Id. at 31. She also informed Plaintiff that the County placed Plaintiff on paid administrative leave and renewed its request that Plaintiff meet with Dr. Burke, "so that we can work in [sic] getting an appropriate plan in place . . . to achieve the ultimate goal of working together to get the best resolution." Id. Later that day, Katie Howard, the Director of Human Resources for Camden County, informed Plaintiff that "at this time, administrative leave is the only option." Id. at 33. She clarified in a later email that because Plaintiff had "previously indicated" that the "requested accommodations" were necessary "to do [his] job," and that the County "could not meet your list of requirements," the County put him on administrative leave "so that [he could] be accommodated and [the County could] further obtain clarification via the second evaluation." Id. at 32.

16

On January 20, 2015, the County, via an email from Howard, renewed its demand that Plaintiff see Dr. Burke. <u>Id.</u> at 36. Howard noted that this was Plaintiff's "final opportunity to comply." <u>Id.</u> The next week, on January 27, 2015, Plaintiff heeded this warning and went to see Dr. Burke. <u>Id.</u> at 37. Dr. Burke's evaluation diagnosed Plaintiff with "Asberger's [sic] Disorder." Dkt. No. 35-9 at 2. The evaluation also noted that Plaintiff "requested some accommodations in the workplace. He would like to work in a more isolated setting or from home. This would be beneficial in dealing [sic] both his sensitivity to noise and his social anxiety related to Asberger's [sic]." <u>Id.</u>

Prior to seeing Dr. Burke, Plaintiff obtained a letter, dated January 26, 2015, from his therapist at LightHorse, Allison Fender. Dkt. No. 35-26 at 38. The letter stated: that Plaintiff was being treated for "low mood, anxiety and recent conflicts at his place of employment," <u>id.</u>; that he had a "lack of desire to socialize and interact verbally in the workplace," <u>id.</u>; and that he would like to work from home in order to "eliminate the potential for interpersonal conflict in the office environment" and minimize distractions. <u>Id.</u> The letter also noted that he had been diagnosed with Autism Spectrum Disorder "without intellectual or language impairment." <u>Id.</u> The letter then quoted Dr. Fairall's report, which recommended that Plaintiff "be given the opportunity to work from home for a period of time to demonstrate his ongoing

O 72A
Rev. 8/82)

ability to fulfill his job." Id. Both the Dr. Burke evaluation and the Fender letter were sent to the County on January 21, 2015. Dkt. No. 35-13 at 1.

On January 29, 2015, Howard sent Plaintiff a "final response" email notifying him that he had been terminated. Dkt. No. 35-26 at 42. The letter reasoned that because Dr. Burke and Fender "detailed the need to 'work from home' and have limited interaction with others" and because "constant interaction with others (staff and students)" are essential functions of Plaintiff's job, then the County had no choice but to fire him. Id. In other words, the County reasoned that it could not provide the accommodations of working from home and limiting "interaction with others" because such accommodations would prevent Plaintiff from performing some of the essential functions of his job. Id.[3] In making the decision to fire Plaintiff, Defendant reviewed Plaintiff's requested accommodations "in regards to limited interactions and work from home . . . as well as the job description to clarify the essential functions of the job." Dkt. No. 30 at 101. Those involved in this decision for the County were Howard, Bishop, Howard's boss Steve Howard, a County attorney John Myers, and another County attorney Doug Duerr. Id. The ultimate decision, however, of

_____

[3] Plaintiff responded with an email, the contents of which are not relevant to this case. Dkt. No. 33-3 at 149.

O 72A
Rev. 8/82)

whether to terminate Plaintiff was made by Katie Howard and Doug Duerr. Id. at 101-02.

Notably, at some point between Plaintiff's termination and the January 7 and 8 email exchange between Plaintiff and Bishop, Bishop emailed someone with the County that she felt "that we have reached a point of no return. This is becoming impossible. Having a person that is supposed to be my assistant and work side by side with me for the 4-H program and is refusing to have verbal conversation with me." Dkt. No. 31-1 at 47. That note was included in Bishop's compilation that she prepared for Baldwin.

## V. Plaintiff's Autism Diagnoses and Symptoms

On November 7, 2014, Plaintiff first went to LightHorse Healthcare to seek psychiatric help. Dkt. No. 35-15 at 4. LightHorse is a community mental health center. Dkt. No. 35-8 ¶ 6. On December 31, 2014, a Licensed Professional Counselor, Lynn Roth, with LightHorse filled out Plaintiff's FMLA leave request form. Dkt. No. 35-15 at 3. The form noted that Plaintiff had been diagnosed as having "Attention-Deficit/Hyperactivity Disorder" and "Inattentive type Social Anxiety Disorder." Id. at 4. The form had a list of symptoms stating that Plaintiff "fe[lt] depressed; [was] anxious and avoidant in social situations; [had] racing thoughts; [was] irritable when stressed; [was] easily angered but [with] no outbursts; [was] easily distracted; [had]

O 72A
Rev. 8/82)

difficulty finishing tasks; [had] worries about social interactions; [and was] highly sensitive to noise levels." Id.

On December 17, 2014, Plaintiff told Dasha that he had been preliminarily diagnosed with Asperger's "and that they were going through the testing to . . . give it an official." Dkt. No. 35-3 ¶ 80. On January 15 and 22, 2015, Dr. Laurie Fairall conducted a series of psychological tests on Plaintiff. Dkt. No. 35-8 ¶ 9. Dr. Fairall was the Director of Psychological Services at LightHorse. Dkt. No. 35-8 ¶ 7. She also had a Doctorate in Psychology as well as Masters degrees in Counseling and Clinical Psychology. Dkt. No. 35-8 ¶ 3. The tests led Dr. Fairall to diagnose Plaintiff with "Autism Spectrum Disorder (ASD) and recurrent, moderate Major Depressive Disorder." Id. ¶¶ 9, 10. ASD includes people with a "wide range—or 'spectrum'-of mental impairments," such as "difficulty communicating or interacting with others, repetitive behaviors, and limited interests or activities." Dkt. No. 35-3 ¶ 10. The spectrum ranges from severe to mild cases; Plaintiff "was on the mildest end of the spectrum," showing no signs of intellectual or language impairment. Dkt. No. 35-8. ¶¶ 12, 13. Prior to "recent changes in the Diagnostic and Statistical Manual of Mental Disorders, [Plaintiff's] condition would have been classified as 'Asperger's Syndrome.'" Id. ¶ 13. Soon after Dr. Fairall's diagnosis, Dr. Burke diagnosed Plaintiff with "Asberger's [sic] Disorder." Dkt. No. 35-9 at 2.

Dr. Fairall concluded that without treatment or accommodation Plaintiff's "ASD substantially limited him in areas including, but not limited to: social interaction, communication, concentration, hearing, and working." Id. ¶ 16. Dr. Fairall particularly focused on how Plaintiff's ASD made it difficult for him to communicate verbally and made him extremely sensitive to sound. Id. ¶ 14. Regarding communication, Plaintiff understood words literally and consequently struggled understanding idioms, jokes, and sarcasm. Id. Along this line, Plaintiff struggled to talk with others because he would "not know[ ] how to say things in a way that would convey the meaning he intended." Id. In addition, Plaintiff was extremely sensitive to noise, such that small sounds "were almost 'painful' to his ears," and background noises were much more distracting than they are for other people. Id. ¶ 15. For instance, if Plaintiff goes to the store "for a period of time" he needs ear plugs because "there's so many sounds" like "the carts, the wheels, the opening and closing of the freezer doors, people talking, people whistling, [and] babies crying." Dkt. No. 33-2 at 42. If he forgets his earplugs, then the noises will become too much for him to handle causing him to stop shopping and leave. Id. at 43.

Finally, sometimes Plaintiff "shuts down because there is too much happening." Dkt. No. 33-2 at 13. When this occurs, Plaintiff stops responding to people and "just kind of sit[s] there with

ᗡ 72A
ev. 8/82)

[his] head down." Id. These instances occur due to a combination of both emotions and too much input from his surroundings. Id. at 13-14. While instances of Plaintiff shutting down are rare, Plaintiff did "shut down" at least twice while working for Defendant. Id. at 46. These two times both occurred during a meeting in which Plaintiff was being disciplined by Bishop. Id. at 44. Plaintiff elaborated that not only noises cause him difficulty when communicating but also emotions: "Emotions are a big part of what I suffer with." Id. at 47. Some of these sessions, Plaintiff felt like he was "being picked on and bullied," which could "become[ ] too much to handle emotionally" and cause him to "shut down." Id.

Plaintiff filed this action to recover damages and other compensation, which he claims are owed to him under the ADA and FMLA. Dkt. No. 1 at 1.

## LEGAL STANDARD

Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the "evidence is such that a reasonable

O 72A
Rev. 8/82)

jury could return a verdict for the nonmoving party." __Id.__  In

making this determination, the court is to view all of the evidence

in the light most favorable to the nonmoving party and draw all

reasonable inferences in that party's favor.  __Johnson v. Booker T.__

__Washington Broad. Serv., Inc.__, 234 F.3d 501, 507 (11th Cir. 2000).

The moving party bears the initial burden of demonstrating

the absence of a genuine issue of material fact.  __Celotex Corp. v.__

__Catrett__, 477 U.S. 317, 323 (1986).  The movant must show the court

that there is an absence of evidence to support the nonmoving

party's case.  __Id.__ at 325.  If the moving party discharges this

burden, the burden shifts to the nonmovant to go beyond the

pleadings and present affirmative evidence to show that a genuine

issue of fact does exist.  __Anderson__, 477 U.S. at 257.

The nonmovant may satisfy this burden in two ways.  First,

the nonmovant "may show that the record in fact contains supporting

evidence, sufficient to withstand a directed verdict motion, which

was 'overlooked or ignored' by the moving party, who has thus

failed to meet the initial burden of showing an absence of

evidence."  __Fitzpatrick v. City of Atlanta__, 2 F.3d 1112, 1116 (11th

Cir. 1993) (quoting __Celotex Corp.__, 477 U.S. at 332 (Brennan, J.,

dissenting)).  Second, the nonmovant "may come forward with

additional evidence sufficient to withstand a directed verdict

motion at trial based on the alleged evidentiary deficiency."  __Id.__

at 1117.  Where the nonmovant attempts to carry this burden instead

\O 72A
Rev. 8/82)

with nothing more "than a repetition of his conclusional allegations, summary judgment for the [movant is] not only proper but required." Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981) (citing Fed. R. Civ. P. 56(e)).

## BACKGROUND

### I. ADA Discrimination Claim

The ADA provides: "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To establish a prima facie case of discrimination under the ADA, an employee must prove three elements: "that, at the time of the adverse employment action, [he] had a disability, [he] was a qualified individual, and [he] was subjected to unlawful discrimination because of [his] disability." United States Equal Employment Opportunity Comm'n v. St. Joseph's Hosp., Inc., 842 F.3d 1333, 1343 (11th Cir. 2016). Here, neither party can prove as a matter of law that Plaintiff was or was not a "qualified individual" within the meaning of the Act. Accordingly, summary judgment on this claim is due to be **DENIED** for both parties.

O 72A
(ev. 8/82)

## A. Was Plaintiff a Qualified Individual?

Under the ADA, a "qualified individual" is one who "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds." 42 U.S.C. § 12111(8). "Accordingly, an ADA plaintiff must show either that he can perform the essential functions of his job without accommodation, or, failing that, . . . that he can perform the essential functions of his job with a reasonable accommodation." Holly v. Clairson Indus., L.L.C., 492 F.3d 1247, 1256 (11th Cir. 2007) (citation omitted). "If the individual is unable to perform an essential function of his job, even with an accommodation, he is, by definition, not a 'qualified individual' and, therefore, not covered under the ADA. In other words, the ADA does not require the employer to eliminate an essential function of the plaintiff's job." Id. (citation omitted). The essential functions "are the fundamental job duties of a position that an individual with a disability is actually required to perform." Id.; see also 29 C.F.R. § 1630.2(n)(2)(i) (stating that a "function may be essential because the reason the position exists is to perform that function").

During Plaintiff's tenure, a 4-H Program Associate in the Camden County Cooperative Extension Office was required to communicate with coworkers. Generally, the role of a Program Associate was to plan, develop, and conduct county sponsored

O 72A
Rev. 8/82)

programs and to carry out tasks "necessary to assist the county extension agent in the day-to-day conduct programs." Dkt. No. 33-2 at 97. Included within this role were the essential duties of "developing, preparing, and organizing 4-H material for club meetings," preparing joint reports with coworkers, participating in staff meetings, and sharing ideas with "co-workers, leaders, district staff, and specialists." Dkt. No. 33-3 at 61, 68. All of these essential duties, or "functions," required Plaintiff to communicate both orally and in writing with his coworkers in the Camden County 4-H Extension Office. Whether Plaintiff could perform this essential function of intra-office communication with or without reasonable accommodations is a disputed genuine issue of material fact.

## 1. Plaintiff is not Entitled to Summary Judgment

Plaintiff argues that because he worked for the County from June 2013 to January 2015, a period of about twenty months, that simple logic dictates he could perform the essential functions of his job or else he would not have held it for so long. In addition, Plaintiff points to the two performance evaluations and numerous write-ups that Plaintiff received during his tenure. These evaluations and write-ups, Plaintiff argues, only show that he performed poorly regarding intra-office communication, not that he was unable to communicate. Thus, Plaintiff concludes that the evidence showing that he was able to communicate with coworkers,

AO 72A
(Rev. 8/82)

albeit poorly, along with the circumstantial evidence of the length of Plaintiff's employment prove that he was a qualified individual as a matter of law. While there is force to this argument, there is also substantial evidence in the record supporting the contention that, with or without reasonable accommodations, Plaintiff was unable to communicate with his office coworkers to the degree necessary to perform the essential duties of his job.

To begin, Plaintiff has not shown as a matter of law that he could perform the essential function at issue without accommodation. Throughout the entirety of his employment with the County, Plaintiff was permitted to wear earplugs whenever he pleased. The earplugs were integral in accommodating Plaintiff's sensory overload issue because they significantly dampened sounds. For instance, when Plaintiff decided to go to a loud location, such as a store, he would prefer earplugs over noise-cancelling headphones because earplugs "dampen[ed] out a bit more sound." Dkt. No. 33-2 at 42. In addition, Plaintiff testified that speaking with someone without his earplugs or headphones "create[d] a lot of issues for [him]" and "can cause [his] stress level to rise and become overwhelmed." Dkt. No. 33-2 at 152-53. Plaintiff also had extreme difficulty concentrating without his earplugs because of this sensitivity to sounds. His sensitivity would make even small sounds almost painful and would cause background noises to become overwhelming. Because Plaintiff

always wore earplugs in the office and because Plaintiff has not presented evidence that he could communicate with his coworkers in the office without earplugs, Plaintiff has not shown that as a matter of law he could perform the essential function of intra-office communication without an accommodation.

Next, whether or not Plaintiff could perform the essential function of intra-office communication with accommodations is a genuine issue of material fact. Evidence regarding this issue falls into two categories: (1) Plaintiff's inability to verbally communicate; and (2) Plaintiff's unstable emotions. Together, these two categories of evidence are sufficient to present a genuine issue of material fact as to whether Plaintiff could perform the essential function of intra-office communication.

Turning to the first category, evidence of Plaintiff's difficulty of verbally communicating with his coworkers was evident from Plaintiff's first performance evaluation, which evaluated the first five months of his tenure. The evaluation contained three relevant comments: that Plaintiff struggled with communications in office meetings; that he needed to improve participation in office meetings; and that he should do a better job with communication. In addition, the only major goal for his improvement as an employee that next year was that he "communicate better with staff." Dkt. No. 35-17 at 5. Notably, Plaintiff disagreed with the evaluation. He believed that he did not need

to communicate better with the staff and thus that this should not have been a major goal for him. Accordingly, Plaintiff testified that he "continued to communicate the same way I always had, which was whenever I needed to." Dkt. No. 33-2 at 143.

Nevertheless, Plaintiff agreed in his deposition that his ability to "socially interact" was "[n]ot well." Dkt. No. 33-2 at 150. In his words, his "mind works very differently than most people," such that he does not "connect with them the same way." Id. Because he has "a very literal mind" that causes him "not to communicate in the same way, people tend to make assumptions and it creates a lot of difficulty in accomplishing things." Id. at 150-51. Plaintiff further testified that "every conversation I have it's limited. It's a lack of understanding, [and] results in a lot of complications." Id. at 158.

Dr. Fairall, a psychologist with LightHorse and who first diagnosed Plaintiff with ASD, recognized that ASD substantially limited Plaintiff in his social interaction, communication, concentration, hearing, and working. She noted that Plaintiff's communication difficulties arose in part because he understood words literally such that it was difficult for him to understand idioms, jokes, and sarcasm. Similarly, Plaintiff struggled to talk to others because he would "not know[ ] how to say things in a way that would convey the meaning he intended." Dkt. No. 35-8 ¶ 14.

Like his first performance evaluation, Plaintiff's second evaluation noted several deficiencies in intra-office communication. This evaluation covered his performance from November 2013 to October 2014. Bishop commented in the evaluation that Plaintiff needed to remember to ask questions when planning and coordinating with staff members for programs, that he struggled working with adults and sharing at staff meetings, and that he was working on his focus in the office setting.

Finally, at times Plaintiff literally lost the ability to speak. Sometimes, he would, in his words, "shut down because there [was] too much happening." Dkt. No. 33-2 at 13. When this occurred, Plaintiff would not respond and "just kind of sit there with [his] head down." Id. These instances occurred due to a combination of both emotions and too much input from his surroundings. While instances of Plaintiff shutting down were rare, instances did occur at least twice during Plaintiff's tenure with the County. Furthermore, the only times Plaintiff "shut down" were when Bishop met with him for disciplinary purposes. Some of these sessions, Plaintiff felt like he was "being picked on and bullied," which could "become[ ] too much to handle emotionally" and cause him to "shut down." Id. at 57.

The record also contains substantial evidence of Plaintiff's severely unstable emotions. Beginning, at the latest, in May 2014, Plaintiff's coworkers had major concerns with Plaintiff's

emotional instability. Jessica Warren, who worked at the 4-H office with Plaintiff, told Bishop that Plaintiff was "antisocial," "unstable," and had "trouble with confrontation" and "an unpredictable temper." Dkt. No. 31-1 at 74. Warren believed Plaintiff's instability was severe enough that he might have been dangerous, making her fear for her safety. Bishop noted around that time, May 2014, that her own major issue with Plaintiff was that he "seem[ed] to be defiant" with her, which was "getting to be too much." Id.

On November 25, 2014, Kathy Strickland, a secretary who worked in the office, wrote a memo for Bishop. Bishop requested that Strickland, Warren, and Sarah Newby, who also worked in the office, write down their concerns after the three continually expressed concerns about Plaintiff to Bishop. Strickland noted that little things seemed to upset Plaintiff and that Plaintiff had "issues with most all the coworkers" and "seem[ed] to try to find things to retaliate (blaming others about things, calling out sick, not having much to say) when he gets corrected." Id. at 43. Strickland stated that Plaintiff had anger management issues, that he got highly agitated, which made her very uncomfortable when that occurred. She feared that Plaintiff may get overly upset and retaliate against the office, putting his coworkers in danger. Newby's memo to Bishop stated that "he doesn't seem to handle criticism very well . . . respond[ing] to critiques on his

professional behavior by blaming others." Id. Newby noted that she thought he "lack[ed] the ability to process his emotions in a socially acceptable manner because he struggles with communicating and/or is unwilling to share what he's feeling." Id. She "observed him muttering under his breath after Kathy [Strickland] ha[d] asked simple requests of him." Id.

In addition to Plaintiff's coworkers, a Licensed Professional Counselor with LightHorse, Lynn Roth, recognized that Plaintiff had severe emotional instability. The counselor stated in Plaintiff's FMLA form that he was depressed, anxious, avoidant in social situations, easily angered, easily frustrated, easily distracted, and highly sensitive to noise levels, that he had racing thoughts, poor coping skills, difficulty finishing tasks, limited ability to navigate social interactions, and that he worried about social interactions. Dr. Fairall, a LightHorse psychiatrist, also concluded that Plaintiff's ASD substantially limited his ability to socially interact. Finally, Allison Fender, a therapist at LightHorse, stated in a letter that she was treating Plaintiff for "low mood, anxiety and recent conflicts at his place of employment." Dkt. No. 35-26 at 38. She also stated that Plaintiff had a "lack of desire to socialize and interact verbally in the workplace." Id.

In the weeks leading up to Plaintiff's termination, Bishop felt that "we have reached a point of no return. This is becoming

O 72A
:ev. 8/82)

impossible.  Having a person that is supposed to be my assistant and work side by side with me for the 4-H program and is refusing to have verbal conversation with me."  Dkt. No. 31-1 at 47.

Plaintiff's primary argument is that this evidence shows *at most* that Plaintiff communicated poorly, not that he was unable to communicate.  This evidence does not dispute that Plaintiff *could* communicate.  Rather, the evidence shows that a reasonable fact-finder could conclude that Plaintiff's poor communication skills coupled with his unstable and unpredictable emotions rendered him unable to perform the essential function of intra-office communication even with reasonable accommodations.

Plaintiff points to eleven reasonable accommodations that were requested and that would have allegedly enabled Plaintiff to perform the essential function of his job as a matter of law: (1) working from home; (2) noise cancelling headphones; (3) relocation to the back office; (4) periodic rest breaks; (5) no "surprise" meetings or coaching sessions; (6) advance notice of meetings and coaching sessions; (7) allow all communication be written except when oral communication is necessary; (8) verbal communication also be provided in writing; (9) an advocate for Plaintiff be present at disciplinary/performance review meetings; (10) socialization/social functions be optional unless necessary for the job; and (11) explaining the logic and providing examples of rules.

Assuming *arguendo* that all eleven of these accommodations were reasonable, Plaintiff still has not met his burden at this stage. Plaintiff's summary judgment argument fails to account for the severity of his emotional instability. The jury would be entitled to weigh such evidence in evaluating Plaintiff's employment. The record shows that Plaintiff had severe emotional issues with negative feedback. When Plaintiff perceived he was being criticized, he could become highly agitated and upset. This fact was not only evident to his coworkers but also to his counselor at LightHorse, Lynn Roth, and his therapist at LightHorse, Allison Fender.

Even Plaintiff testified that he sometimes became so emotional that he shut down; "Emotions are a big part of what I suffer with." Dkt. No. 33-2 at 47. A reasonable jury could conclude based on this record that these accommodations would not adequately address Plaintiff's anger management issues to the degree necessary for him to be able to perform the essential function of intra-office communication. Indeed, for each of the eleven accommodations, Plaintiff argues that they would help him reduce stress. See Dkt. No. 35-1 at 13-18; Plaintiff's Brief in Support of Motion for Summary Judgment. Plaintiff even testified that these accommodations would allow him "to maintain a job for a longer period of time by cutting down on all the stresses involved with it." Dkt. No. 33-2 at 220. Ignoring the implication

72A
v. 8/82)

of this statement that Plaintiff believed he was unable to maintain *any* job, Plaintiff's primary reason for asking for these accommodations was to relieve stress. To Plaintiff, "stress is a simple way of describing a whole lot of different emotions and issues that I have difficulty with." Id. at 258. Thus, the issue that Plaintiff has not sufficiently proven at this stage of the proceeding is whether his stress and emotional instability would be reduced enough to allow him to communicate with his coworkers to the degree necessary to perform the essential functions of the job. For the reasons stated, Plaintiff's Motion for Summary Judgment on this issue is due to be **DENIED**.

## 2. Defendant is not Entitled to Summary Judgment

Defendant cannot show as a matter of law that Plaintiff could not perform the essential function of intra-office communication with reasonable accommodations. As discussed, Plaintiff's eleven recommended accommodations all purportedly would have reduced his stress to one degree or another. Many of them, such as the work from home, communications primarily over email, and work in the back office, would have also reduced his sensory overload issue to some extent. Defendant's primary argument is that these accommodations were not reasonable, but on this record Defendant has not proven this as a matter of law.

O 72A
Rev. 8/82)

First, however, Defendant argues that some of the accommodations that Plaintiff lists in his brief were not sufficiently requested. The Court finds that they were all requested either on January 8, 2015, when Plaintiff's email to Dasha, a human resources employee for the County, had a letter attached from Allison Fender, a psychotherapist at LightHorse, that listed thirteen "possible options that may be helpful to all parties concerned," dkt. no. 35-26 at 26, or on January 27, 2015, in another letter from Fender that Plaintiff sent to Katie Howard, the County's Director of Human Resources, which recommended that Plaintiff be allowed to work from home if possible.

Turning to the main issue, a factfinder could reasonably find that the three primary accommodations that Plaintiff requested were all reasonable. First, a reasonable factfinder could conclude that the work from home accommodation was reasonable. Plaintiff only requested to work from home when possible. Bishop testified that sometimes she does paperwork from home. Thus, Plaintiff could have reasonably worked from home *some*. Second, the noise-cancelling headphones may have helped with Plaintiff's stress. Even though for Plaintiff earplugs dampen more noise than noise-cancelling headphones, *at the very least* from a psychological standpoint, Plaintiff having his choice of the two might have reduced stress. Defendant argues that Plaintiff would not have been able to hear the phone or the doorbell, making the headphones

) 72A
ev. 8/82)

an unreasonable accommodation. Plaintiff disputes this. Whether he could or not is an issue of fact for a factfinder to decide. Third, allowing Plaintiff to move to the back office may have been reasonable. Plaintiff has countered that Defendant's numerous reasons for not allowing him to move to the back office were all easily fixable. Again, this is an issue of fact that a factfinder must decide.

The remainder of the accommodations all present genuine issues of material fact as to whether they are reasonable, or whether they "transform" the essential functions of Plaintiff's position, as Defendant has argued for many of the accommodations. In other words, Defendant has not met its burden of proving as a matter of law that any of the accommodations were not reasonable. As a corollary, Defendant has not shown as a matter of law that Plaintiff could not perform the essential functions of his job with some or all of the accommodations that he requested. Accordingly, Defendant's motion for summary judgment on this issue is due to be **DENIED**.

## II. ADA Retaliation Claim

The ADA also provides that "no person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner

) 72A
ev. 8/82)

in an investigation, proceeding, or hearing under [the ADA]." 42 U.S.C. § 12203(a). To establish a prima facie case of retaliation under the ADA, Plaintiff must establish that he (1) engaged in statutorily protected activity, (2) suffered an adverse employment action, and (3) that a causal connection exists between the two. Batson v. Salvation Army, 897 F.3d 1320, 1329 (11th Cir. 2018). If Plaintiff establishes these three elements, then "the burden shifts to the employer to articulate a nondiscriminatory reason for the adverse action." Id.

If Defendant does this, then the burden shifts back to Plaintiff, who must show that Defendant's proffered reason was pretextual. Id. A plaintiff satisfies this burden "by presenting evidence sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." Id. (internal quotation marks and citation omitted). Plaintiff must show "that the reason was false and that discrimination was the real reason." Wood v. Calhoun Cty. Fla., 626 F. App'x 954, 956 (11th Cir. 2015) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)). Plaintiff may do this by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons that a reasonable factfinder could find them unworthy of credence."

O 72A
(ev. 8/82)

Holton v. First Coast Serv. Options, Inc., 703 F. App'x 917, 923 (11th Cir. 2017).

Plaintiff can establish a prima facie case of retaliation. First, Plaintiff engaged in statutorily protected activity when he requested reasonable accommodations from the County. For this element of a prima facie case, "it is sufficient that an employee have a good faith, objectively reasonable belief that his activity is protected by the statute." Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1328 (11th Cir. 1998). Here, Plaintiff had a good faith and objectively reasonable belief that his activity was protected by the statute. On December 17, 2014, Plaintiff told Dasha that he had been preliminarily diagnosed with Asperger's. In January 2015, this preliminary diagnosis was confirmed by both Dr. Fairall and Dr. Burke. Thus, Plaintiff's belief that he was disabled and thus qualified for reasonable accommodations was objectively reasonable. Furthermore, he engaged in statutorily protected activity when he emailed Katie Howard on January 28, 2015, and requested "to begin again the interactive process of discussing accommodation." Dkt. No. 35-26 at 39. This email occurred after his official diagnoses by Dr. Fairall and Dr. Burke. Second, Plaintiff unquestionably suffered an adverse employment action when he was fired on January 29, 2015. Finally, a causal connection existed between the two. Defendant's proffered reason for firing Plaintiff was because he could not perform the essential

functions of his job with or without reasonable accommodations. Thus, Defendant's stated reason for firing Plaintiff was a direct response to Plaintiff's requests for accommodations that would have allegedly enabled him to perform the essential functions of his job. Accordingly, Plaintiff has established a prima facie case of retaliation under the ADA.

Next, Defendant has articulated a nondiscriminatory reason for Plaintiff's termination sufficient to shift the burden back to Plaintiff. In its termination letter, Defendant noted that Dr. Burke and Allison Fender "detailed the need to 'work from home' and have limited interaction with others." Dkt. No. 35-26 at 42. Defendant went on to state in relevant part that "per [Plaintiff's] job description and essential functions, constant interaction with others (staff and students), is a basic job requirement of the 4-H Program. . . . we have determined that the County is unable to provide you with the requested reasonable accommodations. Since we cannot accommodate you in your current role . . . we will have to release you from employment." Id. Furthermore, Howard, as one of the County's designated organizational representatives who testified pursuant to Civil Procedure Rule 30(b)(6) on "[e]ach and every reason for Plaintiff's termination," dkt. no. 35-24 ¶ 7, recounted the County's position that the only reason Plaintiff was terminated was because "[h]e could not meet the essential functions of the job." Dkt. No. 30 at 100. In making this decision, Howard

testified that the County reviewed Plaintiff's requested "accommodations in regards to limited interactions and work from home . . . as well as the job description to clarify the essential functions of the job." Id. at 101. Considering the termination email and Howard's testimony, Defendant has articulated a nondiscriminatory reason for the adverse action. The burden now shifts to Plaintiff to present evidence "sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." Batson, 897 F.3d at 1329.

Plaintiff's primary argument that Defendant's proffered reason was pretextual fails on its face. Plaintiff argues that Howard testified that the County's "*sole* justification for terminating Mr. Castleberry is . . . a specific assertion that he could not perform [the essential duties] *from home*." Dkt. No. 35-1 at 33 (emphases added); Defendant's Motion for Summary Judgment and Brief in Support; see also id. at 32-33 (emphasis in original) ("[Howard's] testimony is that [Plaintiff] was terminated because the County determined he could not perform his job from home, as requested in one of his proposed accommodations."). Plaintiff argues that this "sole justification" is so important because it is a "transparent misrepresentation of his accommodation request." Id. at 33.

AO 72A
(Rev. 8/82)

Plaintiff, however, misrepresents the termination email and Howard's testimony. As previously quoted, the termination email noted Plaintiff's request "to 'work from home' *and have limited interaction with others*." Dkt. No. 35-26 at 42 (emphasis added). Howard testified that the County considered the "accommodations in regards to *limited interactions* and work from home." Dkt. No. 30 at 101. Defendant clearly recognized Plaintiff's request for multiple accommodations by the use of the plural "accommodations." In addition, Defendant included the conjunction "and" in between "limited interactions" and "work from home" denoting that the County considered more than one accommodation, not just the accommodation of working from home. In its termination email, Defendant referenced Dr. Burke's evaluation and a letter from Allison Fender from LightHorse. Dr. Burke's evaluation noted that Plaintiff requested the accommodations of "work[ing] in a more isolated setting or from home." Dkt. No. 35-9 at 2. The Fender letter stated that Plaintiff "feels he would be more suited to work from home." Dkt. No. 35-26 at 38. The Fender letter also quoted Dr. Fairall's recommendation that "it would be recommended and beneficial for Mr. Castleberry to be given the opportunity to work from home." Id. Given this evidence, it is easy to see why Defendant specifically noted the work from home accommodation. Regardless, this argument of Plaintiff's fails.

Plaintiff's next argument is that the timing of Plaintiff's termination in relation to Defendant learning both of his disability and of his complaint of discrimination demonstrates that the justification was pretextual. Plaintiff contends that he was fired less than two days from when Defendant learned about Plaintiff's disability. Plaintiff also contends that he was fired within one day of his complaint of discrimination.

"Although a plaintiff can use temporal proximity to show a defendant's proffered reason for termination was pretextual, temporal proximity alone does not establish pretext." Jackson v. Hennessy Auto, 190 F. App'x 765, 768 (11th Cir. 2006). Here, Plaintiff has shown sufficient evidence of pretext beyond temporal proximity.

First, Plaintiff argues that Howard's failure to contact "the psychologists to clarify the disability of the accommodation, despite her testimony that seeking such clarification is the County's practice," dkt. no. 35-1 at 34, is evidence of pretext. Again, Plaintiff has materially misrepresented Howard's testimony. Howard testified that "typically" if an employee requests an accommodation she would "try to reach out on the phone and set up a meeting, but if the employee refuses to do that then I have to go to email." Dkt. No. 30 at 44. Howard's testimony focuses on clarifying accommodations *with the employee* and not with his or her doctors. Howard later testified that the reason for this

practice is because reaching out to an employee's doctor is illegal under the Health Insurance Portability and Accountability Act ("HIPAA") without the employee's authorization. In this case, Howard testified that she had "no signed release for medical records." Id. at 59. Last, Howard did testify that she "made multiple calls" to Plaintiff regarding his accommodation requests, and finally reached out to him by email. In that email, her first sentence was "[s]ince I cannot get a hold of you via phone, and you prefer written explanation, I wanted to give you an update on your requested accommodations." Dkt. No. 35-26 at 31.

Second, Plaintiff argues that Bishop's "retaliatory animus is shown in the fact that she laced her invitation to discuss accommodations with threatening questions: 'Do you like this job? Do you want this job?'" Dkt. No. 35-1 at 34. These questions posed by Bishop show an inference of animus. Bishop explained in her deposition that she included these questions for two reasons: (1) because of Plaintiff's attitude problems with coworkers in the office; and (2) because Plaintiff had complained to Bishop's supervisors even after meetings with Bishop, Plaintiff, and Bishop's supervisors. Regarding the second point, Bishop elaborated that she "was confused of why he was still having concerns and issues and . . . not coming to me with those concerns but rather going to other people." Dkt. No. 31 at 82. Thus, Bishop testified that Plaintiff "seemed to just continue to have

44

problems with the job." Id. at 81. Considering the gravity of the tension between Plaintiff and his office coworkers at that time and Bishop's difficulties working with Plaintiff, two reasonable inferences can be drawn from these questions: (1) that Bishop harbored animus toward Plaintiff; or (2) that Bishop genuinely was concerned with whether Plaintiff liked his job and whether he wanted his job. In considering Defendant's motion for summary judgment, the Court must draw all reasonable inferences in Plaintiff's favor.

Third, Plaintiff argues that pretext "is shown by the fact that Ms. Howard admits she never investigated [Plaintiff's] complaint of ADA retaliation." Dkt. No. 35-1 at 34 (citing Dkt. No. 30 at 90-91; Howard 30(b)(6) Depo.). The ADA complaint that Plaintiff refers to is an email that Plaintiff sent to Howard on January 28, 2014. Plaintiff complained in that email that Bishop's actions of "keeping [Plaintiff] out of the loop" and removing him from websites were "retaliatory in nature." Id. This argument fails, however, because Howard had no reason to investigate Bishop for a possible ADA retaliation violation. What Bishop did, remove Plaintiff from certain websites affiliated with the Camden County 4-H Extension Office, was exactly what Howard requested her to do on January 20, 2015, i.e., to "make sure that you, [Bishop,] or the staff are not contacting [Plaintiff] or communicating with him in any matter." Dkt. No. 31-1 at 51.

AO 72A
(Rev. 8/82)

Finally, Plaintiff argues that "any claim that [Plaintiff] could not perform his job is belied by the extensive evidence . . . that he was qualified for his position." Dkt. No. 35-1 at 34. The Court has already determined that Plaintiff has presented sufficient evidence by which a reasonable factfinder could find that Plaintiff could perform the essential functions of his job with reasonable accommodations. Rehashing that evidence, it shows that Plaintiff held his job for more than seventeen months, that he did verbally communicate effectively with his coworkers on many occasions, and that his performance evaluations showed only that he communicated poorly, not that he was unable to communicate.

In summary, Plaintiff has presented the following evidence that Defendant's proffered reason was pretextual: (1) Plaintiff was fired less than two days after his official diagnoses of ASD; (2) the two questions Bishop asked Plaintiff in an email; and (3) the evidence that Plaintiff could perform his job. The issue, then, is whether all of this evidence is sufficient to permit a reasonable factfinder to conclude "*both* that [Defendant's proffered] reason was false, *and* that discrimination was the real reason." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993) (emphasis in original).

To begin, the temporal evidence is strong. Plaintiff was fired less than two days after Dr. Burke confirmed Dr. Fairall's diagnosis that Plaintiff had ASD. The timing of the firing raises

AO 72A
(Rev. 8/82)

the reasonable inference that Defendant fired Plaintiff because he had a disability that entitled him to reasonable accommodations under the ADA. But, Plaintiff must show more. See Jackson v. Hennessy Auto, 190 F. App'x 765, 768 (11th Cir. 2006) ("Although a plaintiff can use temporal proximity to show a defendant's proffered reason for termination was pretextual, temporal proximity alone does not establish pretext.").

Turning to the questions by Bishop, this piece of evidence could support a finding of pretext. First, Bishop was one of five people involved in the decision to fire Plaintiff. While Bishop did not make the ultimate decision to fire Plaintiff, she had the ear of the two people that did, Katie Howard and Doug Duerr, one of the County's attorneys. Second, it is reasonable to infer that Howard and Duerr gave particular weight to Bishop's opinion on whether to fire Plaintiff because Bishop was his immediate supervisor and was required to work closely with Plaintiff. In the words of Bishop, Plaintiff was "supposed to be my assistant and work side by side with me for the 4-H program." Dkt. No. 31-1 at 47. Because the Court at this stage views reasonable inferences in Plaintiff's favor, this piece of evidence supports a finding of pretext.

Finally, the evidence showing that Plaintiff could perform his job combined with the evidence of temporal proximity and of Bishop's animus is sufficient to raise a genuine issue of material

AO 72A
(Rev. 8/82)

fact as to whether the County's proffered reason was pretextual. As thoroughly explored in the qualified individual section of the ADA discrimination claim, substantial evidence exists from which a reasonable factfinder could conclude that Plaintiff could perform the essential functions of his job with reasonable accommodations. This evidence could erode the foundation of Defendant's proffered nondiscriminatory reason. If a factfinder finds that it is more likely than not that Plaintiff could perform the essential function of his job with reasonable accommodations, it could also find that Defendant's proffered reason lies on a shaky foundation, pointing to a conclusion that the reason was pretextual. The factfinder could further find that the timing of Plaintiff's firing in relation to his official diagnoses of ASD and Bishop's animus both point to a conclusion of pretext. Finally, a reasonable factfinder could conclude that all of this evidence makes it more likely than not that Defendant's proffered nondiscriminatory reason was pretextual. Accordingly, Defendant's motion on this issue is due to be **DENIED**.

Plaintiff's motion on this issue is also due to be denied. While there is some circumstantial evidence that Defendant's proffered reason was pretextual, this evidence does not show that it was pretextual as a matter of law. First, the timing evidence is strong evidence of pretext, but, of course, more is needed. Second, Bishop's animus does not necessarily taint the Defendant's

AO 72A
(Rev. 8/82)

decision to fire Plaintiff. As discussed, two other decisionmakers had ultimate authority and made the ultimate decision to fire Plaintiff. Even if Bishop provided information tainted by animus to Howard and Duerr, Plaintiff has not provided any evidence that Howard and Duerr used this information when making the ultimate decision. Furthermore, when considering Plaintiff's motion the Court must draw this inference in favor of Bishop, i.e., that the questions were not evidence of animus. Finally, if a factfinder finds that Plaintiff could not perform the essential functions of his job with reasonable accommodations, then it could easily conclude that Defendant's identical finding was correct. As a corollary, the factfinder could reasonably find that Defendant's proffered reason was not pretextual. Accordingly, Plaintiff's motion on this issue is due to be **DENIED**.

## III.   **FMLA Interference and Retaliation Claims**

"Under the FMLA, an eligible employee is entitled to up to twelve weeks of leave each year to care for the employee's child, spouse, or parent who has a serious health condition. See 29 U.S.C. § 2612(a)(1). "'To preserve the availability of these rights, and to enforce them, the FMLA creates two types of claims: interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, see 29 U.S.C. § 2615(a)(1), and retaliation claims, in

which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act, see 29 U.S.C. § 2615(a)(1) & (2); 29 C.F.R. § 825.220(c).'" Wascura v. City of S. Miami, 257 F.3d 1238, 1247-48 (11th Cir. 2001) (quoting Strickland v. Water Works and Sewer Bd., 239 F.3d 1199, 1206 (11th Cir. 2001)).

"In order to state an interference claim under the FMLA, an employee need only demonstrate by a preponderance of the evidence that he was entitled to a benefit the employer denied." Jarvela v. Crete Carrier Corp., 776 F.3d 822, 831 (11th Cir. 2015) (citation omitted). For an FMLA interference claim, the employer's motives are irrelevant. Martin v. Brevard Cty. Pub. Schs., 543 F.3d 1261, 1266-67 (11th Cir. 2008). Importantly, "an employee can be dismissed, preventing her from exercising her right to commence FMLA leave, without thereby violating the FMLA, if the employee would have been dismissed regardless of any request for FMLA leave." Krutzig v. Pulte Home Corp., 602 F.3d 1231, 1236 (11th Cir. 2010).

To establish a prima facie case of retaliation under the FMLA, an employee must show that, "(1) he engaged in statutorily protected activity, (2) he suffered an adverse employment decision, and (3) the decision was causally related to the protected activity." Jarvela, 776 F.3d at 832 (11th Cir. 2015) (citation omitted).

AO 72A
(Rev. 8/82)

Here, the "adverse employment decision" for the retaliation claim was Plaintiff's termination; also, the interference claim rests on the denial of Plaintiff's FMLA benefits due to his termination. Defendant's defense against both claims is that Plaintiff's dismissal would have occurred regardless of Plaintiff exercising his right to FMLA leave. "At summary judgment, then, the analyses for an FMLA interference claim based on an employee's termination and an FMLA retaliation claim are essentially the same: we ask whether the evidence, viewed in the light most favorable to the non-moving party, establishes as a matter of law that the employer would have terminated the employee regardless of her request for or use of FMLA leave."[4] Batson v. Salvation Army, 897 F.3d 1320, 1331 (11th Cir. 2018).

For the same reasons that Defendant and Plaintiff are not entitled to judgment as a matter of law on the ADA retaliation claim, neither party has shown as a matter of law that Defendant would or would not have terminated Plaintiff regardless of his use of FMLA leave. See Batson, 897 F.3d at 1331-32 ("Because [plaintiff] raises evidence from which a reasonable jury could conclude that [defendant]'s proffered explanations for terminating

---

[4] Even though the analyses for these two claims "merge at the summary judgment stage, at trial, it remains the employer's burden to establish its affirmative defense by showing that it did not interfere with its employee's substantive rights under the FMLA by terminating the employee." Batson, 897 F.3d at 1236 n.6.

AO 72A
Rev. 8/82)

[plaintiff] were pretextual, she likewise raises a genuine dispute of material fact as to whether she would have been terminated regardless of her request for FMLA leave."). Accordingly, Defendant's motion for summary judgment on these claims are due to be **DENIED**; Plaintiff's motion for partial summary judgment on these claims are due to be **DENIED**.

## CONCLUSION

For these reasons, Defendant's motion for summary judgment, dkt. no. 33, is **DENIED**. Plaintiff's motion for partial summary judgment, dkt. no. 35, is **DENIED**.

**SO ORDERED**, this 30th day of September, 2018.

HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
Rev. 8/82)